# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

EM, BY HER NEXT FRIEND ADAM
MUNSTERMAN, ET AL.,
      PLAINTIFFS,

VS.

LIBERTY PUBLIC SCHOOLS 53, ET
AL.

      DEFENDANTS.

CASE 4:26-CV-90-BCW
JURY TRIAL DEMANDED

## First Amended Complaint

1.     On March 3, 2022, four seventh-graders gathered before school. One read aloud:

> For God so loved the world, that He gave his only begotten Son, that whosoever believeth in Him should not perish, but have everlasting life.

2.     Those are the words of the Gospel of John, chapter three, verse sixteen (King James Version).

3.     Their principal called it sex harassment.

4.     She banned the students from school for ten days.

5.     This lawsuit challenges the unlawful and unconstitutional punishment of two of the students, EM and MD.

6.     The two Plaintiff students were permanently branded as "sex harassers" in their disciplinary records—not for any sexual conduct, not for any harassment, not for any disruption— but for reading Scripture in a hallway.

1

7.     Allegri apparently reacted to the students' private, off-campus group chat in which they agreed to share the Gospel message with "emos."

8.     "Emo" is slang, describing a youth subculture typified by strong emotion and angst—and sometimes depression, self-harm and suicide.

9.     The students believed their classmates, including any "emos," might benefit from hearing the good news.

10.    Further, some students in the chat had recently attended a youth service in which the minister encouraged the youth to be vocal in their faith.

11.    Among themselves, the students developed a plan to read John 3:16 out loud before school.

12.    The School's security video recorded the result: on the morning of March 3, 2022, the two Plaintiffs were joined by two other students walking through the halls of the school with a Bible.

13.    A short cell phone video captured a first-person view of the group, reading John 3:16 out loud at a conversational volume, confirming their later representations.

14.    The videos show Plaintiffs' speech was not indecent. Not vulgar. Not lewd. Not drug promoting. Not school sponsored.

15.    And the videos show Plaintiffs' speech was peaceful. No student was disrupted. No student was impeded. No class disturbed. No rights were invaded.

16.    And so, none of Plaintiffs' actions or speech fell into a category that might be limited or punished the school.

17.    Yet Principal Allegri punished the students' religiously-motivated speech with the harshest penalty the Principal could impose by herself: a ten-day out of school suspension.

18.    Even more egregiously, Principal Allegri pressured the students to delete their own video evidence, depriving them of due process.

19.    Allegri filed false reports that claimed the students did things they did not do. Allegri failed to note the video contradicted these outlandish claims.

20.    And when the Plaintiffs appealed to the Board, the Board ratified the suspension, telling Plaintiffs their conduct was "harassment."

21.    This starkly contrasts with the way Allegri and the District treat other speech, even religious speech, when they support the viewpoint.

22.    Liberty students have engaged in more than one political demonstration – the kind of "walkout" that removes students from the middle of classes.

23.    In 2022, District students walked out of school to protest bills in the Missouri legislature that they deemed racist and/or "anti-LGBTQ."

24.    In recent days, scores of District students marched out of school in the middle of class to protest immigration policy; some held bullhorns, others held signs with Bible verses or words like "Jesus was an immigrant."

25.    These protestors holding signs with religious messages intended to persuade others to change their conduct. The protestors' messages might deeply offend students with different ideas about Jesus or politics.

26.    But student protestors engaged in that kind of religious-political activism are not suspended for ten days out of school in the Liberty district, or even five days. They receive no punishment at all.

27.    In fact, the protesters received a warm letter from District administrators, affirming a promise that protestors will "feel safe, supported, and connected while at school."

3

28.     Plaintiffs held no signs. Plaintiffs disrupted no classes. Plaintiffs used no bullhorns.

29.     But Plaintiffs were not made to feel safe, supported, and connected after they read John 3:16 out loud. Plaintiffs were banned from school and branded as troublemakers and "sexual harassers."

30.     Indeed, Plaintiffs are aware of cases of student-on-student physical violence at Heritage Middle School punished less harshly than their reading of John 3:16.

31.     This shows that the District treats favored religious speech differently from disfavored religious speech; it punishes the latter more harshly than the former.

32.     In punishing their viewpoint, Defendants violated Plaintiffs' rights.

33.     Plaintiffs bring eight claims to vindicate these rights.

    A.  First, Allegri violated the First Amendment by punishing this religious speech.

    B.  Second and third, the District's board ratified that violation and through deliberate indifference – failing for eight years to adopt policies Missouri law requires.

    C.  Fourth and fifth, Allegri and the District violated due process by branding Plaintiffs' "sexual harassers" without meaningful opportunities to clear their names.

    D.  Sixth through Eighth, Defendants violated Missouri's Religious Freedom Restoration Act, Student Religious Liberties Act, and Constitution.

34.    Plaintiffs now seek declaratory, injunctive, and monetary relief from all Defendants, as well as attorney's fees. Additionally, Plaintiffs seek punitive damages against Allegri.

## Jurisdiction & Venue

35. This Court has subject matter jurisdiction under 28 U.S.C. §1331 and 1343.

36. The acts in this suit occurred in Clay County, Missouri, and Defendants reside in Clay County, so venue is proper here. 28 U.S.C. §1391(b)(2).

37. This Court has authority to grant the requested declaratory relief; 28 U.S.C. §2201, *et seq.*, 42 U.S.C. §2000cc, *et seq.*

38.    This Court has authority to issue the requested injunctive relief. Fed.R.Civ.P. 65 and 28 U.S.C. §1343(3).

39.    This Court exercises supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367. Missouri statutes §§ 167.161 and 536.150, RSMo., authorize judicial review of student suspensions and unconstitutional school district actions.

## Parties

40.    Plaintiff EM was a seventh-grader at Heritage Middle School during the 2021-22 academic year. A minor residing with her parents in Clay County, she brings this suit through her father and next friend, Adam Munsterman.

41.    Plaintiff MD was a seventh-grader at Heritage Middle School during the 2021-22 academic year. A minor residing with his parents in Clay County, he brings this suit through his mother and next friend, Johnna Dembski.

5

42.     Defendant Reagan Allegri is Principal of Heritage Middle School in Liberty Public Schools 53, Clay County. She is sued in her official and individual capacities.

43.     Defendant Liberty 53 School District of Clay County ("District") is a public school district in Clay County, Missouri.

44.     Defendants act under color of law under Missouri statutes and regulations.

45.     Allegri has general oversight over her school; the District's highest decisionmaker is its seven-person board.

## Allegations Common to All Counts

### Events of March 3-4, 2022

46.     As detailed above, on March 3, 2022, four students read John 3:16 in the minutes before class, to share the Gospel with classmates who might need to hear it.

47.     The School's security video shows the Plaintiffs and two other students walking through the halls before school with a Bible.

48.     A short video recorded on a cell phone captured one of the students reading John 3:16, confirming their later representations.

49.     The videos show no one impeded, no raised voices, no irritation because of Plaintiffs' actions —just students walking past each other peacefully.

50.     Later that afternoon, during a passing period, one of the other two students from the morning group (but not one of the Plaintiffs), read from the Bible in a bustling commons area while facing a group of students at a table a short distance away. This non-Plaintiff student is referred to as "Student A."

51.     Neither of Plaintiffs participated in the "passing period" reading. Plaintiff EM was walking through the area to her next class and climbed the stairs at the

6

opposite end of the commons; security video shows her briefly speaking with another student at a distance but not participating in the Bible reading.

52.     Plaintiff MD was not present at the afternoon event at all.

53.     Video of the afternoon incident shows yet another student, Student B, who was walking through the commons closer to Student A; when Student B saw Student A reading a Bible, he raised his hand and exclaimed "God is good!"

54.     Upon information and belief, one of the students at the table near Student A lodged a complaint about the reading.

55.     Student A's decision to read the Bible near other students during a passing period should not have been punished; but Plaintiffs did not participate in this conduct or plan for it. Plaintiff MD was not even in the vicinity of the afternoon reading.

56.     Principal Reagan Allegri suspended Plaintiffs EM and MD for ten days, even though EM and MD had only been part of a group reading John 3:16.

57.     Upon information and belief, Allegri even suspended Student B for his exclamation "God is good!"

58.     Allegri invoked Policy AC, which prohibits only illegal harassment—not merely offensive speech.

59.     Allegri called Plaintiffs' speech 'illegal sex harassment,' apparently because the students had discussed their desire to share a religious message with "the emos."

60.     Despite EM and MD denying any involvement in the afternoon events, Allegri concluded that all students who read the Bible on March 3, 2022 (or even affirmed that "God is good!") violated the School's policies against illegal sexual harassment.

7

61.    The next day, March 4, Allegri kept Plaintiffs out of school for an "investigation." Without notice to parents or access to counsel, she pressured the students to recant their religious beliefs and turn over their phones.

62.    Allegri declared that the students' off-campus group chat—private messages on personal devices—proved a conspiracy to commit illegal harassment.

63.    Then Allegri ordered the students to delete their videos of themselves reading John 3:16.

64.    EM had recorded the morning Scripture reading. It showed four students reading peacefully. No confrontation. No disruption. No harassment.

65.    Allegri pushed EM to delete it—depriving EM of exculpatory evidence.

66.    Allegri apparently made her own copy of EM's video; Plaintiffs managed to view the video only months later, under a Sunshine Law request, and not permitted to make copies.

67.    With the students' contradictory evidence unavailable to them, Allegri filed false reports claiming she'd seen video of Plaintiffs and others "find[ing] [the emos] in different areas of the building and call[ing] them names" and "laugh[ing] at them."

68.    Allegri also included in her written disciplinary report an allegation from one student that Plaintiffs had been 'barking like dogs' at other students.

69.    All the video evidence contradicts Allegri's claims.

70.    EM's video never showed EM or MD approaching students or calling names or barking like dogs. It proved Allegri's written report about them was false.

71.     On March 8, Allegri notified Plaintiffs of a one-day suspension for unlawful sexual harassment, completed on March 4—the investigation day. She then escalated it to ten days.

72.     Other teachers were told Plaintiffs had been suspended; the Plaintiffs had to interact with these teachers to obtain their homework during the suspension.

73.     Plaintiffs were humiliated having to interact with these teachers, knowing that they had been told Plaintiffs had committed serious misconduct justifying a harsh suspension—when the basis for that suspension was false.

74.     Under Liberty School District's policies, a ten-day, out-of-school suspension is the maximum punishment that Allegri could give without automatic review by higher authorities.

75.     Allegri imposed a ten-day suspension on EM and MD, even though they had not engaged in any misconduct, merely based on their out-of-school association with other religious students who shared their beliefs.

76.     Allegri's imposition of a ten-day suspension for offensive speech placed higher penalties on disfavored *religious* speech versus non-religious speech or favored religious speech and was based on the religious viewpoint of the students.

77.     Allegri treated religious speech far more harshly than other speech, harsher even than violence. Students who committed physical assaults received lighter punishment than students who read John 3:16.

78.     Meanwhile, students who engage in political protest, arrange mass walk outs, defy district policy by absenting themselves from class, use bull horns and placards with Bible verses, are not punished at all – so long as their religious viewpoint is approved by the District.

79.     Plaintiffs appealed to the Board, citing religious discrimination and requesting removal of the "sexual harassment" finding.

80.     Board members told them the Constitution does not protect "harassing" religious speech.

81.     Instead, the District's board ratified the suspension, making it permanent in the Plaintiffs' records.

82.     The District maintains Policy JG-R1 defining "harassment" as "unwelcome conduct based on religion"—including "comments" and "written material." Under this policy, any religious expression becomes sanctionable if a listener deems it "unwelcome," regardless of disruption or objective standards.

83.     Allegri used this facially unconstitutional standard to punish Plaintiffs' religious viewpoint.

84.     Missouri law requires school districts to "prevent discrimination against students on the basis of their religious viewpoint in all places where students may engage in expression, including...school hallways." § 160.2500, RSMo.

85.     Missouri law says Districts must adopt policies protecting voluntary religious expression. *Id.*

86.     The District never adopted such policies.

87.     Instead, Policy JG-R1 authorizes the discrimination § 160.2500 forbids. And Policy INC declares classrooms a "closed forum"—ignoring Missouri's protection of religious expression before, during, and after class.

88.     The District's policy fails to make any allowance that Missouri's legislature prohibited religious expression content discrimination before, during, and after class, where students may express private beliefs.

10

89. Thus, the District and Allegri have imposed unlawful viewpoint and content discrimination on students, despite directly applicable Missouri laws forbidding these limits.

## Sovereign Immunity Issues

90. Sovereign-immunity does not bar any of Plaintiffs' claims.

91. Plaintiffs may bring federal claims against both Allegri and the District, as both are "persons" under § 1983. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978).

92. To the extent sovereign immunity otherwise applies, Missouri has waived it under § 537.610, RSMo. (to the extent of insurance coverage) and provides judicial review of governmental decisions under §§ 167.161 and 536.150, RSMo.

## Count I: First Amendment Violation – Punishing Scripture Reading (42 U.S.C. §1983 Against Allegri, Individual Capacity)

93. Plaintiffs incorporate all preceding paragraphs of this complaint by reference, as if set forth fully at this point.

### Hybrid Nature of Claims

94. Plaintiffs engaged in constitutionally protected speech by reading John 3:16 aloud in school hallways before class.

95. Plaintiffs simultaneously engaged in religious exercise—the Christian practice of evangelism, devotion, and public identification with Christ through public scripture reading.

11

96.    Plaintiffs' speech and religious practice in this matter are inseparable; for Christians, evangelism and public scripture reading are equally an expression of religious ideas and a religious exercise.

97.    This combination of Free Speech and Free Exercise violations creates what the Supreme Court has recognized as a "hybrid rights" claim, and the government's policies and actions are subject to strict scrutiny.

98.    When government restricts religious speech based on viewpoint, it violates both constitutional protections simultaneously.

Defendant Allegri Violated Plaintiffs' Speech & Religion Rights

99.    Defendant Allegri imposed severe punishment on Plaintiffs: a ten-day suspension (the maximum available without Board review) and a permanent false label of "sexual harassment" in Plaintiffs' records.

100.    The punishment branded Plaintiffs as sexual harassers or troublemakers before teachers, classmates, and future colleges. It robbed them of ten days of school. And it would silence any student of ordinary courage.

101.    Defendant Allegri's motivation was hostility toward Plaintiffs' religious viewpoint.

102.    John 3:16 contains no sexual content whatsoever. The verse speaks only of God's love and salvation through Christ.

103.    The only explanation for calling this 'sexual harassment' is disapproval of the student's particular Christian viewpoint; Allegri punished Plaintiffs because they believed certain students would benefit from hearing their religious message. It

appears Allegri decided the students' desire to evangelize "emos" implied sex stereotyping or criticism of sexual orientation.

104.    But labeling a peaceful reading of John 3:16 as unlawful "harassment" demonstrates either deliberate disregard for constitutional protections or reckless indifference to clearly established law.

105.    Allegri examined Plaintiffs' private off-campus religious discussions and characterized their Christian beliefs as "conspiracy to harass."

106.    Allegri also forced students to delete exculpatory video evidence, then filed false reports claiming the videos showed conduct that never occurred.

107.    Video evidence shows students passing peacefully in the hallways before school with no impediment, no raised voices, no confrontations. No class was disturbed. No teacher's authority was undermined. No student's rights were invaded.

108.    Plaintiffs' speech falls into none of the narrow categories schools may regulate. It was not lewd, vulgar, or indecent. It did not promote illegal drug use. It was not school-sponsored speech bearing the school's imprimatur. It was private student expression during free time before class.

109.    Allegri's restriction was neither neutral toward religion nor generally applicable. District Policy JG-R1 specifically targets "conduct based on religion" for prohibition as "harassment."

110.    Allegri characterized religious reading as "conspiracy to harass" based solely on religious content, religious speech, or religious association.

13

111. Students who committed physical violence received lighter punishment than students who read John 3:16; Allegri imposed maximum punishment on religious speech while permitting comparable secular speech.

112. This selective enforcement demonstrates that the restriction was not a neutral rule of general applicability but targeted suppression of religious viewpoint.

## Defendant Allegri's Actions Do Not Satisfy Strict Scrutiny

113. Whether analyzed as viewpoint discrimination under the Free Speech Clause, targeting of religious exercise under the Free Exercise Clause, or as a hybrid rights violation, Defendant's actions are subject to strict scrutiny.

114. Defendant Allegri had no compelling interest in prohibiting students from reading John 3:16 in hallways before class. The verse harmed no one, disrupted nothing, and invaded no rights.

115. Defendant Allegri's assertion that she responded to "harassment" is pretextual—reading a Gospel verse about divine love is not harassment under any objective standard. Mere offense at the potential implications of Plaintiffs' religious viewpoint does not justify suppression.

116. Less restrictive alternatives existed to respond to legitimate compelling interests: Defendant could have addressed actual disruption through viewpoint-neutral standards or stopped genuine harassment through objective criteria.

117. Because Defendant cannot demonstrate compelling interest achieved through least restrictive means, her actions violated the First Amendment.

14

Qualified Immunity Is Unavailable to Allegri

118.    By March 2022, the Supreme Court and the Eighth Circuit had held for decades that schools cannot discriminate against student speech based on religious viewpoint, that student speech may be restricted only when it substantially disrupts school operations, and that viewpoint discrimination is presumptively unconstitutional.

119.    Every reasonable school official knew these principles.

120.    Missouri law provided additional notice of these constitutional rules. Since 2014, Missouri's Student Religious Liberties Act, § 160.2500, RSMo., has required schools to allow student religious expression "before, during and after the school day."

121.    Defendant Allegri had further notice from the District's own policies, which identify many of the legal precedents against punishing religious speech.

122.    Even without a case involving identical facts, the violation was obviously unconstitutional. No reasonable official could believe that John 3:16—a verse about God's love and salvation—constitutes "sexual harassment." No reasonable official could believe that peaceful Scripture reading before class, causing zero disruption captured on video, substantially interferes with school operations.

123.    No reasonable official could believe that punishing religious speech while permitting secular speech is viewpoint-neutral.

124.    No reasonable official could believe that punishing some religious viewpoints while permitting other religious viewpoints is viewpoint-neutral.

125. Defendant Allegri is not entitled to qualified immunity. She violated Plaintiffs' clearly established constitutional rights, and the law was so clear that every reasonable official would have understood the conduct violated those rights.

PUNITIVE DAMAGES ARE WARRANTED

126. Allegri's violation was not negligent; it showed deliberate or reckless disregard for constitutional protections, demonstrated by labeling John 3:16 as sexual harassment, monitoring and punishing private religious discussions, forcing students to delete exculpatory evidence, filing false reports, and imposing maximum punishment for peaceful religious speech.

127. Defendant Allegri's violations directly caused Plaintiffs' injuries: ten-day suspension and lost educational services; permanent false "sexual harassment" label affecting college admissions, employment, and professional licensing; reputational harm and stigma; emotional distress, humiliation, and anxiety; chilling of religious expression; and harm to future opportunities.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor on Count I and all relief requested in the Prayer for Relief, including compensatory and punitive damages against Defendant Allegri individually.

## COUNT II: FIRST AMENDMENT VIOLATION – BOARD RATIFIES PUNISHING SCRIPTURE READING (42 U.S.C. § 1983 AGAINST DISTRICT - MONELL LIABILITY VIA FINAL POLICYMAKER)

128. Plaintiffs incorporate all preceding paragraphs by reference.

16

129. The constitutional violations against Plaintiffs were ratified and adopted as official District policy by the Board of Education acting as final policymaker under Missouri law.

130. Under Missouri law, "The government and control of a seven-director school district … is vested in a board of education…." § 162.261, RSMo.

131. The Board of Education possesses final policymaking authority over all aspects of district operations, including student discipline.

132. Missouri law authorizes school boards to delegate limited disciplinary authority to principals. Under § 167.171, RSMo., "the school board in any district, by general rule…may authorize the summary suspension of pupils by principals of schools for a period not to exceed ten school days."

133. The Board retains direct statutory authority over student discipline. § 167.161, RSMo., provides: "The school board of any district, after notice to parents…and a hearing upon charges preferred, may suspend or expel a pupil…."

134. When the Board exercises this authority after hearing, it acts as final policymaker, not as a reviewer of delegated discretion.

135. There is no further administrative appeal beyond the Board within the District.

The Board Ratified the Constitutional Violation

136. Defendant Allegri imposed a ten-day suspension on Plaintiffs—the maximum she could inflict under authority delegated by the Board.

137.    By imposing this maximum punishment for reading Scripture, Allegri acted under Board policies, including Policy JG-R1, which authorizes punishment of "unwelcome conduct based on religion."

138.    Plaintiffs appealed their suspensions to the Board, challenging both the factual basis and the religious discrimination contained within the decision.

139.    The Board conducted a hearing pursuant to its direct statutory authority under § 167.161, RSMo.

140.    The Board reviewed the evidence, heard constitutional arguments, and had full authority to reverse the suspension and remove the "sexual harassment" finding.

141.    Board members told Plaintiffs and their parents that the Constitution does not protect "harassing" religious speech.

142.    The Board voted to affirm the suspension and refused to remove the "sexual harassment" label from Plaintiffs' records.

143.    The Board's affirmance was not ministerial review of delegated authority but an exercise of the Board's own final policymaking power.

144.    Having been informed of the constitutional violations, the Board made a deliberate choice to ratify the discipline and maintain the policy framework authorizing it.

### The Board's Decision Established Official District Policy

145.    When a final policymaker makes a deliberate decision after full consideration of constitutional objections, that decision establishes official municipal policy.

146.    A single decision by a final policymaker is sufficient when the official has authority to make policy with respect to the challenged action.

18

147. The Board's ratification after hearing made the constitutional violation official District policy.

148. The Board thus decided that students may be suspended for reading Scripture in hallways, that religious expression may be labeled "sexual harassment" when deemed "unwelcome," and that constitutional protections do not prevent punishment of religious viewpoint.

149. This policy determination was deliberate, not inadvertent. The Board was expressly informed of the constitutional issues, given the opportunity to correct the violation, and chose instead to affirm it.

150. The Board's decision reflects a policy choice that religious viewpoint may be suppressed in District schools.

151. The Board ratified not only the specific suspension but also the underlying policy framework.

152. By affirming the discipline, the Board endorsed the policy's authorization of viewpoint-based discrimination.

Causation & Damages

153. The Board's ratification directly caused continuing injury to Plaintiffs.

154. The "sexual harassment" finding remains in Plaintiffs' permanent records.

155. The District's policy authorizing discrimination against religious viewpoint remains in effect, chilling Plaintiffs' future religious expression.

156. Defendant District, through the Board's final policymaking decision, violated Plaintiffs' constitutional rights and caused the injuries detailed in Count I.

19

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor on Count II and all relief requested in the Prayer for Relief.

## COUNT III: First Amendment Violation – Board Ignores Missouri Law Duty To Adopt And Implement Student Religious Speech Policies. (42 U.S.C. § 1983 Against District - Monell Liability Via Deliberate Indifference)

157.     Plaintiffs incorporate all preceding paragraphs of this complaint by reference, as if set forth fully at this point.

158.     Missouri law mandates that school districts adopt and implement policies protecting student religious expression. § 160.2500.6, RSMo.

159.     This statute, effective since 2014, reflects the Missouri Legislature's determination that religious viewpoint discrimination in schools is a persistent and obvious threat requiring specific protective policies.

160.     By enacting § 160.2500, the Legislature declared Missouri school districts must adopt affirmative safeguards to protect these constitutional rights.

### The District's Policy Failures

161.     Despite this statutory mandate in effect for years before the violations in this case, the District failed to adopt any policy affirmatively protecting student religious expression in hallways, cafeterias, or other areas where students engage in expression.

162.     Rather than adopt policies that prevent discrimination as § 160.2500 requires, the District adopted Policy JG-R1, which authorizes discrimination. Policy JG-R1 defines "harassment" to include "unwelcome conduct based on religion,"

making religious expression sanctionable whenever a listener deems it "unwelcome."

163. JG-R1 directly contravenes § 160.2500's mandate. Where the statute requires policies that prevent discrimination against religious viewpoint, Policy JG-R1 authorizes such discrimination.

164. The District's failure to adopt statutorily required policies demonstrates that its written policies are deficient facially and as applied to Plaintiffs—they omit the religious freedom protections Missouri law mandates and instead authorize viewpoint discrimination.

## The District's Training Failures

165. The District failed to adequately train administrators and teachers on First Amendment protections for student religious expression. This failure is demonstrated by the District's policies themselves, which fail to include the religious freedom elements required by § 160.2500, RSMo.

166. Indeed, it appears the District's publicly available policies contain no reference to § 160.2500, RSMo. This omission demonstrates the District's failure to implement the statute's requirements.

167. The need for such training was obvious. The Missouri Legislature mandated specific policies precisely because religious viewpoint discrimination is a recurring problem requiring training and guidance. The very existence of § 160.2500 put the District on notice that officials need training to prevent religious viewpoint discrimination.

168.    The District's failure to train is further evidenced by Defendant Allegri's conduct: she labeled John 3:16 as "sexual harassment," characterized religious belief as "conspiracy to harass," and punished students for religious viewpoint—demonstrating complete ignorance of basic First Amendment principles.

169.    Had the District provided adequate training, Allegri would have known that religious expression in hallways is protected and that a group Scripture reading cannot constitute sexual harassment.

170.    The Board's conduct similarly demonstrates lack of training. Board members told Plaintiffs that the Constitution does not protect harassing speech—reflecting fundamental misunderstanding of First Amendment law.

171.    This statement demonstrates that even the District's policymaking body lacked basic training on constitutional protections for religious expression.

DELIBERATE INDIFFERENCE

172.    The risk that students' religious expression would be unconstitutionally suppressed was obvious. The Missouri Legislature declared it obvious by mandating protective policies.

173.    The District had actual notice of this risk and of its training obligations for eight years. From at least 2014 through March 2022, the District knew it was required to adopt and implement policies preventing religious viewpoint discrimination.

174.    Implicit in the statutory mandate to "implement" is the obligation to train officials on those policies and on constitutional protections for religious speech.

175.    The District violated both statutory requirements: it failed to 'adopt' policies protecting religious viewpoint (instead adopting Policy JG-R1, which authorizes

discrimination), and it failed to 'implement' any such policies through training and enforcement.

176.    The District's conduct constitutes deliberate indifference to Plaintiffs' constitutional rights.

177.    The District made a deliberate choice to ignore statutory mandates designed to prevent constitutional violations.

178.    The District chose to maintain Policy JG-R1, which authorizes the very discrimination § 160.2500 forbids.

179.    The District chose to inadequately train officials on First Amendment protections despite the obvious need for such training.

180.    This was not negligence, but conscious policy choice maintained over years.

DIRECT CAUSATION

181.    The District's deliberate indifference directly caused the constitutional violations that injured Plaintiffs.

182.    Had the District adopted policies as required by § 160.2500 and trained officials on First Amendment protections for religious expression, Allegri would have known that religious expression in hallways is protected, would have known that Scripture reading cannot constitute sexual harassment, and would not have punished Plaintiffs for their religious viewpoint.

183.    Had the District trained the Board on constitutional protections, Board members would have known that the Constitution protects religious speech even when some listeners find it offensive, and the Board would have reversed rather than ratified the unconstitutional discipline.

23

184.     The policy vacuum and training deficit created by the District's deliberate failures enabled the constitutional violations. The District's deliberate choice to maintain facially deficient policies and provide no training directly caused Plaintiffs' injuries.

185.     But for the District's deliberate indifference—its eight-year failure to adopt statutorily mandated policies, its failure to train officials on First Amendment protections, and its maintenance of Policy JG-R1 authorizing viewpoint discrimination—the constitutional violations would not have occurred.

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment in their favor on Count III.

## COUNT IV: False "Sex Harassment" Label Without Due Process (Fourteenth Amendment – Stigma-Plus Against Allegri - Individual Capacity)

186.     Plaintiffs incorporate all preceding paragraphs of this complaint by reference, as if set forth fully at this point.

### Stigmatizing False Accusation

187.     Defendant Allegri falsely accused Plaintiffs of unlawful harassment, "sexual harassment," and/or "sex harassment" in official disciplinary records and proceedings. This accusation is objectively false—Plaintiffs read John 3:16, which contains no sexual content whatsoever.

188.    Plaintiffs engaged in no sexual conduct, made no sexual comments, and committed no harassment, made no comments based on another student's sex. The label is a complete fabrication.

189.    Allegri made this false accusation public by recording it in permanent educational records accessible to school personnel, notifying teachers of the suspension, and creating records that will be disclosed to colleges, employers, and licensing boards.

190.    Being labeled a harasser – and especially a "sexual harasser" – is among the most serious reputational injuries a student can suffer, suggesting sexual misconduct, predatory behavior, and moral depravity.

## Tangible Deprivation

191.    Plaintiffs have liberty and property interests in their education and reputation as it affects future opportunities. Students have a protected interest in not being falsely accused of sexual misconduct in official records.

192.    Plaintiffs were deprived of their property rights in the videos they lawfully recorded, and which Allegri forced them to delete as a school official with authority.

193.    Beyond stigma, Plaintiffs suffered tangible deprivations: ten-day suspensions denying their right to education, permanent disciplinary record affecting college admissions and employment, mandatory disclosure to third parties, and disqualification from honors, scholarships, and opportunities requiring clean records.

## Inadequate Process

194.    Due process requires meaningful opportunity to clear one's name from stigmatizing false accusations. Allegri provided no such opportunity.

195.    The investigation was conducted without notice to parents or access to counsel.

196.    Students were coerced to delete exculpatory video evidence, making it difficult for them to appeal or prove their innocence to parents.

197.    Allegri acted as investigator, prosecutor, and judge—not a neutral factfinder. Plaintiffs had no opportunity to present defense before the finding was recorded in permanent files.

198.    Even the Board hearing did not address whether the "harassment" characterization was false. No process provided meaningful opportunity to refute the false accusation or clear names.

199.    The process was constitutionally inadequate: designed to confirm a predetermined outcome, included destruction of exculpatory evidence, lacked neutral decision-maker, and denied opportunity to refute false accusations.

## Clearly Established Law

200.    By March 2022, it was clearly established that officials violate due process when they make stigmatizing false accusations in connection with deprivation of liberty or property without providing opportunity to clear one's name.

201.    The Eighth Circuit had established that students have due process rights when accused of serious sexual misconduct and that officials must provide meaningful process to refute such accusations. Every reasonable official knew this.

202.    No reasonable official could believe that reading John 3:16 constitutes "sexual harassment" or that the process provided here satisfied due process.

CAUSATION & DAMAGES

203.    Allegri's violation directly caused reputational harm, humiliation, emotional distress, damage to college and employment prospects, ongoing anxiety about disclosure, inability to clear names, and permanent stain on reputation.

204.    Defendant Allegri acted under color of state law as Principal under Missouri statutes and District policies.

**WHEREFORE, P**laintiffs respectfully request judgment in their favor on Count IV and all relief requested in the Prayer for Relief, including compensatory and punitive damages against Defendant Allegri individually.

**COUNT V: RATIFYING FALSE SEXUAL HARASSMENT LABEL WITHOUT DUE PROCESS (FOURTEENTH AMENDMENT DUE PROCESS- STIGMA-PLUS AGAINST DISTRICT VIA MONELL LIABILITY)**

205.    Plaintiffs incorporate all preceding paragraphs of this complaint by reference, as if set forth fully at this point.

206.    The District, through its Board, acted as final policymaker under Missouri law, and ratified the false "sexual harassment" accusation against Plaintiffs.

207.    Plaintiffs appealed to the Board and requested removal of the false "sexual harassment" label. Plaintiffs informed the Board that the label was objectively false— John 3:16 contains no sexual content.

208. The Board refused to remove the false label and voted to affirm both the suspension and the "sexual harassment" finding, making the stigma-plus violation official District policy.

209. Even after Board review, Plaintiffs had no meaningful opportunity to clear their names. The Board hearing focused on justifying the suspension, not on the falsity of the "sexual harassment" characterization. The Board ratified the stigma without providing constitutionally adequate process to refute it.

## DISTRICT POLICY AUTHORIZED THE VIOLATION

210. District Policy JG-R1 authorizes officials to label religious conduct as "harassment" based solely on whether listeners deem it "unwelcome," with no requirement that the conduct constitute true harassment.

211. The policy provides no procedural safeguards to ensure accuracy of accusations, no meaningful process for students to refute false characterizations before they are recorded in permanent files, and no mechanism to clear names from stigmatizing labels even when proven false.

212. The District maintains the false "sexual harassment" label in Plaintiffs' permanent records despite video evidence proving the falsity of the accusation and even though reading John 3:16 cannot constitute sexual harassment.

213. The District provides no adequate remedial process for students to clear their names from false official accusations, even when those accusations are false.

214.    The District's ratification of the false accusation and its maintenance of the stigmatizing label in permanent records directly caused continuing injury in the form of ongoing reputational harm, mandatory future disclosures to colleges and employers, exclusion from opportunities, inability to clear names, and permanent damage to Plaintiffs' futures.

215.    The Board acted under color of state law pursuant to its final policymaking authority under Missouri statutes.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor on Count V.

## COUNT VI: VIOLATION OF MISSOURI RELIGIOUS FREEDOM RESTORATION ACT (§§ 1.302, 1.307, RSMO.)

216.    Plaintiffs incorporate all preceding paragraphs of this complaint by reference, as if set forth fully at this point.

217.    Missouri's Religious Freedom Restoration Act, § 1.302.1, RSMo., provides: A governmental authority may not restrict a person's free exercise of religion, unless:
    (1) The restriction is in the form of a rule of general applicability, and does not discriminate against religion, or among religions; and
    (2) The governmental authority demonstrates that application of the restriction to the person is essential to further a compelling governmental interest, and is not unduly restrictive considering the relevant circumstances.

218.    As used in the Act, "exercise of religion" includes actions substantially motivated by religious belief, whether the religious exercise is compulsory or central to a larger system of religious belief. § 1.302.2, RSMo.

219.     The Act applies to all state and local laws, resolutions and ordinances *and the implementation of such laws*, resolutions, and ordinances, whether statutory or otherwise.

220.     The actions of Allegri and the District are implementations of state and local laws, whether statutory or otherwise; and the directions, policies, and procedures of the District and Allegri have the force or color of law.

221.     Plaintiffs took actions substantially motivated by their religious beliefs, including reading scripture aloud as an expression of devotion, evangelism, and discipleship, and as an expression of their religious faith.

222.     Defendants (both Principal Allegri acting under District authority, and the District itself) imposed substantial burdens on Plaintiffs' religious exercise by:

    A.  Punishing Plaintiffs with ten-day suspension for engaging in religious exercise;

    B.  Labeling their religious exercise "sexual harassment" and permanently recording this false characterization in their educational records;

    C.  Threatening future punishment for similar religious expression;

    D.  Creating and/or enforcing policies (AC, JG-R1) that make religious exercise sanctionable whenever deemed "unwelcome" by listeners;

    E.  Chilling Plaintiffs' future willingness to engage in public religious expression.

223.     These burdens are substantial because they:

    A.  Subject Plaintiffs to maximum punishment available to school administrators;

30

B. Permanently and falsely stigmatized Plaintiffs as "sexual harassers" for religious conduct;

C. Condition religious exercise on approval of hostile listeners (heckler's veto);

D. Coerce Plaintiffs to abandon core religious practices or face severe consequences;

E. Deprived the students of their right to public education, now and in the future.

224. Defendant District cannot demonstrate that its substantial burden on Plaintiffs' religious exercise furthered a compelling governmental interest achieved through reasonably restrictive means.

225. The Defendants had no compelling interest in prohibiting students from reading John 3:16 in school hallways before classes and Plaintiffs' conduct caused no disruption, invaded no rights, and harmed no students.

226. Mere offense taken by listeners at religious viewpoint is not compelling interest.

227. The Defendants used unduly restrictive methods in punishing the Plaintiffs' speech, including the following:

A. The Defendants used policies that are not viewpoint neutral.

B. Ten-day suspension for peaceful Scripture reading is not the least restrictive means of achieving any legitimate objective.

C. The Defendants labeled lawful religious expression as "harassment."

D. The District's definition of harassment as "unwelcome conduct" is not narrowly tailored, and fails to satisfy the requirements of § 160.2500,

31

RSMo., and could have addressed genuine harassment through objective standards.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor on Count VI.

## COUNT VII: VIOLATION OF MISSOURI STUDENT RELIGIOUS LIBERTIES ACT (§ 160.2500, RSMO.) (AGAINST ALLEGRI AND DISTRICT)

228.     Plaintiffs incorporate all preceding paragraphs of this complaint by reference, as if set forth fully at this point.

229.     Missouri has adopted a Missouri Student Religious Liberties Act, § 160.2500, RSMo. It enumerates numerous ways in which the Constitution protects public school students' religious expression, including, in part:

- "Students in public schools may pray or engage in religious activities or religious expression **before, during and after the school day** in the same manner and to the same extent that students may engage in nonreligious activities or expression…" § 160.2500.4, RSMo. (emph. added).

- "Students may organize prayer groups, religious clubs, or other religious gatherings **before, during and after school** to the same extent that students are permitted to organize other noncurricular student activities and groups." *Id.* (emph. added).

- "A school district shall treat a student's voluntary expression of a religious viewpoint, if any, on an otherwise permissible subject in the same manner the

district treats a student's voluntary expression of a secular or other viewpoint on an otherwise permissible subject." § 160.2500.2, RSMo.

- "Students may express their beliefs about religion in homework, artwork, and other written and oral assignments free from discrimination based on the religious content of their submissions." § 160.2500.3, RSMo.

230. Moreover, the Student Religious Liberty Act requires all school districts to adopt and implement certain policies on "voluntary student expression of religious viewpoints," consistent with the Act. § 160.2500.6, RSMo.

231. The rights protected in § 160.2500.2 through § 160.2500.5 give the District and Allegri clear notice of applicable law under the United States Constitution, and under Missouri law.

232. Despite the clear mandate in the Student Religious Liberty Act, the Defendants violated Plaintiffs' rights.

233. Despite the clear mandate, the Defendants failed to adopt or implement the statutorily required policies protecting voluntary student expression of religious viewpoints, before, during and after school.

234. Despite the clear mandate, the District has adopted policies (including JG-R1) that facially violate the rights protected by the Student Religious Liberty Act.

235. Despite the clear mandate, the Defendants District and Allegri have enforced policies (including JG-R1 and AC) against the Plaintiffs in ways that violate the Constitutional rights protected by the Student Religious Liberty Act.

236. Plaintiffs have been damaged by Defendants' violations of their rights protected by the Act, the failure to implement the required policies, the

discriminatory application of the existing policies against them, and the chilling effect of the policies remaining on the books.

237.    Plaintiffs have liberty and property rights in their education. *State ex rel. Yarber v. McHenry*, 915 S.W.2d 325, 328 (Mo.1995).

238.    § 160.2500, RSMo., is phrased to protect a specific class of persons, public school students subjected to religious discrimination, and Plaintiffs have a private right to sue for damages as members of that group.

239.    Moreover, whether Plaintiffs may be awarded damages, Missouri law authorizes actions by plaintiffs to seek declaratory relief, injunctive relief, mandamus or prohibition according to § 536.150, RSMo.; and court review of the constitutionality of public school disciplinary action under § 167.161, RSMo.


**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor on Count VII.

## COUNT VIII: Violations of Missouri Constitution (Art. I, §§ 2, 5, 9 & 10; Against Allegri & District)

240.    Plaintiffs incorporate by reference all preceding paragraphs.

241.    Article I, § 2 of the Missouri Constitution provides:

> That all constitutional government is intended to promote the general welfare of the people; that all persons have a natural **right to** life, **liberty**, the pursuit of happiness and the enjoyment of the gains of their own industry; that all persons are created equal and are entitled to **equal rights and opportunity under the law**; that to give security to these things is the principal office of government, and that when government does not confer this security, it fails in its chief design. (emph. added).

34

242.     Article I, § 5 of Missouri's Constitution provides, in part:

>  All men and women have a **natural and indefeasible right to worship** Almighty God according to the dictates of their own consciences; that no human authority can control or interfere with the **rights of conscience** … "nor shall a citizen's right to pray or **express his or her religious beliefs** be infringed"… "the state shall ensure **public school students their right to free exercise of religious expression without interference**, as long as such prayer or other expression is private and voluntary, whether individually or corporately, and in a manner that is not disruptive and as long as such prayers or expressions abide within the same parameters placed upon any other free speech under similar circumstance." (emph. added).

243.     Article I, § 9 of the Missouri Constitution provides:

>  That the people have the **right peaceably to assemble for their common good,** …. (emphasis added)

244.     Article I, § 10 of the Missouri Constitution provides:

>  That no person shall be deprived of life, liberty or property without **due process** of law.

245.     The Defendants violated these Missouri Constitutional rights of the Plaintiffs by application of its policies to them, by conducting a sham investigation that pressured them to delete exculpatory evidence, by the unwarranted suspension, and by the defamatory "sexual harassment" finding.

246.     The Defendants' current policies and threats to enforce them continue to violate Plaintiffs' rights and chill their religious expression.

247.     The Plaintiffs have been damaged by these violations.

248.     Plaintiffs have liberty and property rights in their education. *State ex rel. Yarber v. McHenry*, 915 S.W.2d 325, 328 (Mo.1995).

249.    To vindicate the rights protected by Missouri's Constitution, Missouri law permits actions by plaintiffs, including provisions for declaratory relief, injunctive relief, mandamus or prohibition according to § 536.150, RSMo.; it also allows judicial review of the constitutionality of public school disciplinary action under § 167.161, RSMo.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor on Count VIII.

### Prayer For Relief

250.    Plaintiffs seek a judgment in their favor against all Defendants on all Counts, including the following relief:

### Declaratory Relief

251.    Declare that Defendants violated Plaintiffs' rights under:

    A.    The First Amendment to the United States Constitution (Freedom of Speech and Free Exercise of Religion) through hybrid viewpoint and religious discrimination, enforced through 42 U.S.C. § 1983;

    B.    The Fourteenth Amendment to the United States Constitution (Due Process) through stigma-plus deprivation without adequate process, enforced through 42 U.S.C. § 1983;

    C.    The Missouri Constitution, Article I, Sections 2, 5, 9, and 10;

    D.    The Missouri Religious Freedom Restoration Act, §§ 1.302 and 1.307, RSMo.; and

36

E.  The Missouri Student Religious Liberties Act, § 160.2500, RSMo.

252.    Declare that District Policy JG-R1 together with District Policy AC, both as they existed in 2022 at the time of Plaintiffs' discipline and as currently in effect are facially unconstitutional under the First Amendment because they:

A.  Are overbroad in violation of the First Amendment, prohibiting substantial amounts of protected religious speech by banning "unwelcome conduct based on religion" including "comments" and "written material";

B.  Are impermissibly vague in violation of the Due Process Clause, failing to provide students of ordinary intelligence fair notice of what religious expression is prohibited and when religious conduct becomes sanctionable "harassment";

C.  Discriminate based on religious viewpoint in violation of the Free Speech Clause by singling out religious expression for prohibition while permitting comparable secular speech;

D.  Authorize a heckler's veto in violation of established First Amendment principles by making religious expression sanctionable based solely on subjective listener reaction rather than objective disruption or harassment standards;

E.  Violate the Free Exercise Clause by targeting religious conduct for prohibition and treating religious exercise as presumptively problematic when deemed "unwelcome"; and

F. Contravene the Missouri Student Religious Liberties Act, § 160.2500(6), RSMo., which mandates policies that prevent rather than authorize discrimination against student religious viewpoint.

253. Declare that Defendant Liberty School District's failure to adopt policies required by § 160.2500(6), RSMo. that affirmatively protect student religious expression in hallways, cafeterias, assemblies, and all areas where students may engage in expression constitutes a violation of Missouri statutory law.

254. Declare that the disciplinary findings against Plaintiffs are void and of no legal effect because they were imposed in violation of Plaintiffs' constitutional and statutory rights, and that all such findings are hereby vacated and set aside.

Injunctive Relief

255. Upon proper motion, issue a preliminary and permanent injunction requiring Defendant District:

A. Immediately remove and permanently expunge from Plaintiffs' educational records all references to this disciplinary incident, including but not limited to:

i. All findings, determinations, or references to "sexual harassment";

ii. All findings, determinations, or references to "conspiracy" or "conspiracy to commit sexual harassment";

iii. All references to the ten-day out-of-school suspension imposed in connection with this incident;

38

        iv. All other negative notations, findings, or characterizations related to these events and subsequent disciplinary proceedings;

B. Provide written confirmation to Plaintiffs and their counsel within thirty (30) days that all such records have been permanently expunged from all District databases, files, and record-keeping systems;

C. Issue corrected records to Plaintiffs reflecting the expungement, and provide letters to Plaintiffs suitable for presentation to colleges, employers, and licensing boards confirming that:

        i. The disciplinary finding has been expunged;

        ii. The students were subject to unconstitutional discipline;

        iii. No sexual harassment occurred;

        iv. The students' records are clear of any such findings;

D. Immediately refrain from enforcing or threatening to enforce their policies against Plaintiffs or other students engaged in non-disruptive religious speech in all areas where students may speak;

E. Adopt policies required by § 160.2500(6), RSMo., that specifically protect student religious expression from both viewpoint discrimination and religious discrimination in all areas where students may speak, including hallways, cafeterias, common areas, and in class;

F. Rescind District Policy JG-R1's prohibition on 'unwelcome conduct based on religion' or submit to the Court for approval specific amendments that cure the constitutional defects;

G. Train all administrators, teachers, and staff on:

39

i. Constitutional protections for religious viewpoints in student speech;

ii. Free Exercise Clause protections for religious conduct;

iii. Prohibition on treating religious perspectives as presumptively harassing or problematic;

iv. Requirements of viewpoint neutrality in disciplinary decisions;

v. Strict scrutiny standard applicable to restrictions on religious speech and exercise;

H. Implement appellate review procedures that require:

i. Identification of whether disciplinary action implicates religious speech or exercise;

ii. Strict scrutiny analysis before affirming discipline affecting religious expression;

iii. Independent review by counsel trained in First Amendment law;

iv. Written findings addressing viewpoint neutrality and religious liberty concerns; and

I. Establish monitoring and reporting systems to detect patterns of discrimination against religious student speech and exercise;

J. Publicly acknowledge that:

i. Religious viewpoints on moral and theological questions are protected speech

ii. Students have right to read Scripture and express religious beliefs on school premises

       iii. Religious perspectives may not be characterized as inherently harassing

       iv. The District violated Plaintiffs' constitutional rights through hybrid viewpoint and religious discrimination.

K. Require Defendants, their officers, employees, agents, successors and all other persons acting in concert or participation with them, to take such actions as may be necessary to prevent the recurrence of such unlawful conduct again, including, but not limited to, religious liberty training to Defendants' personnel.

256. Upon proper motion, issue a preliminary and permanent injunction requiring Defendant Allegri to:

A. Refrain from disciplining, threatening, harassing, or retaliating against Plaintiffs or any other students for engaging in non-disruptive religious expression in hallways, cafeterias, common areas, classrooms, or any other location where students may engage in expression;

B. Refrain from characterizing religious expression as 'harassment,' 'sexual harassment,' 'unwelcome conduct,' or any similar pejorative term based on religious content or viewpoint;

C. Complete all training required by this Court's injunction against the District, including annual recertification; and

D. Comply with all District policies adopted pursuant to this injunction protecting student religious expression.

## Monetary Relief / Damages

257.    Award each Plaintiff compensatory damages against Defendants Principal Allegri individually and Liberty School District, jointly and severally, in amounts to be determined by a jury, for:

      A.   Emotional distress, anxiety, and psychological harm to EM and MD;

      B.   Reputational damage from false 'sexual harassment' accusation;

      C.   Educational disruption, loss of enjoyment, and lost opportunities during the ten-day suspension and because of it;

      D.   Stigma and humiliation toward EM and MD;

      E.   Past and future harm to educational and professional prospects;

      F.   Interference with and chilling of Plaintiffs' free speech and free exercise of religion;

      G.   All other damages proven at trial;

258.    Award Plaintiffs punitive damages against Defendant Allegri individually for malicious, willful, and reckless disregard of Plaintiffs' clearly established constitutional rights;

259.    Award Plaintiffs their costs and reasonable attorney's fees under 42 U.S.C. § 1988 and any other applicable federal or state law authorizing fee awards to prevailing parties in civil rights actions;

260.    Alternatively, if no compensatory damages are awarded despite finding constitutional violations, award Plaintiffs nominal damages of ten dollars per Plaintiff per violation, sufficient to support attorney's fees under § 1988.

## Other Relief

261.     Plaintiffs seek an Order for any other relief that the Court deems just and equitable in these premises.

## Jury Demand

Plaintiffs request a trial by jury on all issues so triable.

Respectfully submitted,

**Law Offices of Jonathan R. Whitehead, LLC**

/s/ Jonathan R. Whitehead
Jonathan R. Whitehead, Mo. 56848
229 S.E. Douglas St., Ste. 210
Lee's Summit, Mo 64063
816.398.8305 - Phone
816.278.9131 – Fax
Jon@WhiteheadLawLLC.com
**Attorney for Plaintiffs EM and MD**

43

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies this document was filed on February 20, 2026, using the Court's electronic filing system, which notified counsel of record of the filing by electronic mail, and a copy was served on counsel of record by electronic mail on the same date as follows:

Mark D. Katz, Esq.
FISHER, PATTERSON, SAYLER & SMITH, LLP
9393 W. 110th Street, Suite 300
Overland Park, Kansas
mkatz@fpsslaw.com
ATTORNEYS FOR DEFENDANT

/s/ Jonathan R. Whitehead
AN ATTORNEY FOR PLAINTIFFS